**DREXEL CHEMICAL COMPANY,**
**Plaintiff/Appellant,**

v.

**BITUMINOUS INSURANCE COMPANY,**
**Defendant/Appellee.**

Court of Appeals of Tennessee,
Western Section,
at Jackson.

June 11, 1996.

Application for permission to appeal
Denied by Supreme Court
Oct. 28, 1996.

its business is unitary with either the commodities groups or the Bond Trading Group.

472

Michael F. Rafferty, Memphis, for plaintiff/appellant.

Robert D. Flynn, Louise P. Gaerig, Memphis, for defendant/appellee.

HIGHERS, Judge.

In this case, plaintiff, Drexel Chemical Co., seeks a declaratory judgment that its insurer, Bituminous Insurance Co., is obligated to defend and indemnify Drexel in a suit currently pending in a Tennessee federal district court. Both Drexel and Bituminous filed motions for summary judgment. The trial court overruled Drexel's motion, but granted Bituminous' motion, holding that a policy exclusion relieved Bituminous of its duty to defend and to provide coverage to Drexel. Drexel has appealed the trial court's judgment, arguing that the underlying claims against it are not excluded by the policy provisions. For the reasons stated hereafter, we affirm.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Drexel is a company engaged in the business of manufacturing chemicals. In 1972, Drexel contracted with Arlington Blending and Packaging Co. (ABPC) for the formulation and packaging of Drexel's chemicals. The formulation process performed by ABPC involved the mixing, relabeling, and packaging of chemicals that were shipped to its site by various chemical companies in order to prepare the chemicals for resale to the consumer. Between 1972 and 1976, Drexel sent its chemicals to ABPC for formulation. In 1974, Drexel purchased a comprehensive general liability and property insurance policy from Bituminous, which covered the period from September 1974, through October 1975.

After conducting an investigation of the ABPC site, the EPA found that hazardous substances that were released incident to the ABPC formulation process had contaminated the soil and the water. The EPA subsequently instituted clean-up procedures. In 1986, the United States filed suit under CERCLA in the federal district court for the Western District of Tennessee against William Bell, who was the president of ABPC, Richard Meeks, vice-president, and three chemical companies that had contracted with ABPC for formulation of their chemicals.

The United States alleged that all defendants were jointly and severally liable for response costs incurred by the United States in the investigation, administration, and enforcement of CERCLA.

In January 1990, two of the original defendant chemical companies, Velsicol Chemical Co. and Terminex International, Inc., filed a third-party complaint against Drexel and several other companies that had contracted with ABPC, seeking contribution in the event that a judgment was rendered against them.

Drexel notified Bituminous of the institution of this suit and requested that Bituminous defend and indemnify it. Bituminous denied liability, and Drexel brought this declaratory judgment action in the Circuit Court of Shelby County. Relying on the following policy exclusion, Bituminous responded that it had no duty either to defend or to indemnify Drexel:

This insurance does not apply:

\* \* \* \* \* \*

(f) to bodily injury or property damage arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

Both Drexel and Bituminous filed motions for summary judgment. The trial court overruled Drexel's motion and granted Bituminous' motion, holding that the pollution exclusion clause relieved Bituminous of its obligation to defend or indemnify Drexel. The trial court further found that the matter did not fall within the "sudden and accidental" exception to the exclusionary clause because the release of hazardous substances alleged in the complaint against Drexel was not sudden and accidental.

On appeal, Drexel contends that the trial court erred in granting summary judgment in favor of Bituminous because the release of hazardous substances that was alleged in the present case was "sudden and accidental"

within the meaning of the pollution exclusion provision.

## II

### *POLICY LANGUAGE AT ISSUE*

The terms of the insurance policy provide, as pertinent to the issues before us:

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury of property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent

. . .

\* \* \* \* \* \*

This insurance does not apply:

\* \* \* \* \* \*

(f) to bodily injury or property damage arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

## III.

### *POSITIONS OF THE PARTIES*

The issue before us is whether the pollution exclusion clause precludes coverage for liability arising from the discharge of chemicals at the ABPC site. Our resolution of this issue turns on the meaning of the phrase "sudden and accidental" as it is used in the pollution exclusion clause. Drexel has presented three alternative arguments on appeal, which are: (1) The pollution exclusion claim in Bituminous' CGL policy does not apply in the present case because the undisputed facts show that the alleged leaks and spills of Drexel's chemicals at the ABPC site were "sudden and accidental"; (2) This court

should follow those courts that have held that the words "sudden and accidental" in the pollution exclusion clause are ambiguous and that the exclusion should be construed strongly against the insurer and in favor of coverage for the insured; and (3) If the court holds that the pollution exclusion is not ambiguous, then there exist genuine issues of material fact that preclude the entry of summary judgment against Drexel.

Conversely, Bituminous argues that the trial court correctly held that no coverage was provided due to the pollution exclusion clause. It is Bituminous' position that the alleged pollution was not "sudden" because it occurred gradually over a period of time, nor was it "accidental," because individuals at ABPC intentionally discharged the chemicals into the environment.

### *IV. ANALYSIS*

#### A. *Pollution Exclusion Clause*

In 1966, the standard form for comprehensive general liability (GCL) insurance policies was revised from an "accident"-based policy to an "occurrence"-based policy. Sharon M. Murphy, Note, *The 'Sudden and Accidental' Exception to the Pollution Exclusion Clause in Comprehensive General Liability Insurance Policies: The Gordian Knot of Environmental Liability*, 45 VAND.L.REV. 161, 165 (1992); E. Joshua Rosenkranz, Note, *The Pollution Exclusion Clause Through the Looking Glass*, 74 GEO.L.J. 1237, 1247 (1986). In the revised policy, "occurrence" was defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Robert M. Tyler, Jr., Todd J. Wilcox, *Pollution Exclusion Clauses: Problems in Interpretation and Application Under the Comprehensive General Liability Policy*, 17 IDAHO L.REV. 497, 499 (1981). Numerous authorities concluded that the result of the revised language defining "occurrence" was that the policies would afford liability coverage for pollution that occurred gradually over a period of time, as long as the pollution was unexpected or unintended. *See, e.g.,* Ronsenkranz, *supra*, at 1247; *Grand River Lime Co. v. Ohio Casual-*

ty *Ins. Co.*, 32 Ohio App.2d 178, 289 N.E.2d 360, 365 (1972); *Queen City Farms, Inc. v. Central Nat'l Ins. Co. of Omaha*, 126 Wash.2d 50, 882 P.2d 703, 717 (1994).

Due to inconsistent judicial interpretations of the term "occurrence," the "qualified pollution exclusion" clause was added to the GCL policies in 1973. Wilcox, *supra,* at 499–50. The pollution exclusion clause that was used between 1973 and 1985, provided:

> This insurance does not apply ... (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gasses, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters; Anatomy of the Comprehensive General Liability Pollution Exclusion,* 75 CORNELL L.REV. 610, 613 (1990).

An enormous amount of litigation and commentary was spawned by the inclusion of the above clause into GCL policies. *Pepper's Steel & Alloys, Inc. v. United States Fidelity and Guaranty Co.*, 668 F.Supp. 1541, 1549 (S.D.Fla.1987) ("The cases swim the report-

ers like fish in a lake.") The gravamen of this debate concerns the proper interpretation of the phrase "sudden and accidental." Courts have debated with particular fervor the meaning of the word "sudden." *Transamerica Ins. Co. v. Duro Bag Manuf. Co.*, 50 F.3d 370, 372 (6th Cir.1995).

■ From this extensive judicial controversy have emerged three positions. The first, and what appears to be the majority position, is that "sudden" implies a temporal aspect. That is, the pollution must occur abruptly in order for the exception to the exclusion to operate to re-trigger coverage. Several state supreme courts have adhered to this view.[1] In addition, the majority of federal courts have followed this position in those states that have not yet addressed the issue.[2]

The second position, which is the minority position, is that "sudden" means "unexpected and unintended." The courts adhering to this view hold that pollution that occurs over a period of time may be found to be "sudden" because "sudden" does not denote any temporal aspect.[3]

Finally, other courts have held that the term "sudden" is ambiguous, and, therefore,

---

1. *Dimmitt Chevrolet v. Southeastern Fidelity Ins. Corp.*, 636 So.2d 700 (Fla.1993); *Lumbermens Mut. Cas. Co. v. Belleville Indus. Inc.*, 407 Mass. 675, 555 N.E.2d 568 (1990), *cert. denied*, 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992); *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392 (1991); *Board of Regents of the Univ. of Minn. v. Royal Ins. Co. of America*, 517 N.W.2d 888 (Minn.1994); *Waste Management of the Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374 (1986); *Hybud Equip. Corp. v. Sphere Drake Ins. Co. Ltd.*, 64 Ohio St.3d 657, 597 N.E.2d 1096 (1992), *cert. denied*, 507 U.S. 987, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993).

2. *Transamerica Ins. Co. v. Duro Bag Manuf. Co.*, 50 F.3d 370 (6th Cir.1995); *Aeroquip, Corp. v. Aetna Cas. and Sur. Co., Inc.*, 26 F.3d 893 (9th Cir.1994); *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153 (4th Cir.1992), *cert. denied*, 506 U.S. 824, 113 S.Ct. 78, 121 L.Ed.2d 42 (1992); *Aetna Cas. & Sur. Co. v. General Dynamics Corp.*, 968 F.2d 707 (8th Cir.1992); *Hartford Acc. & Indem. Co. v. United States Fidel-*

*ity & Guar. Co.*, 962 F.2d 1484 (10th Cir.1992), *cert. denied*, 506 U.S. 955, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992); *Northern Ins. Co. v. Aardvark Assocs.*, 942 F.2d 189 (3rd Cir.1991); *A. Johnson & Co. v. Aetna Cas. & Sur. Co.*, 933 F.2d 66 (1st Cir.1991); *New York v. AMRO Realty Corp.*, 936 F.2d 1420 (2d Cir.1991); *New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162 (3rd Cir.1991), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993); *FL Aerospace v. Aetna Cas. & Sur. Co.*, 897 F.2d 214 (6th Cir.1990), *cert. denied*, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990); *United States Fidelity & Guar. Ins. Co. v. Murray Ohio Manuf. Co.*, 875 F.2d 868 (6th Cir.1989); *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31 (6th Cir.1988); *Great Lakes Container Corp. v. Nat'l Union Fire Ins. Co.*, 727 F.2d 30 (1st Cir.1984).

3. *Nat'l Grange Mut. Ins. Co. v. Continental Cas. Ins. Co.*, 650 F.Supp. 1404 (S.D.N.Y.1986); *Lansco, Inc. v. Dept. of Environmental Protection*, 145 N.J.Super. 433, 368 A.2d 363 (1976), *cert. denied*, 73 N.J. 57, 372 A.2d 322 (1977).

the question of coverage should be resolved in favor of the insured.[4]

We have found no decision from any Tennessee state court that has addressed the issue of the construction to be afforded the phrase "sudden and accidental" within the context of a pollution exclusion clause. However, in *United States Fidelity & Guaranty Co. v. Murray Ohio Manuf. Co.*, 693 F.Supp. 617 (M.D.Tenn.1988), *aff'd*, 875 F.2d 868 (6th Cir.1989), the federal district court for the Middle District of Tennessee held that Tennessee courts would find that the term "sudden" combines both the idea of "unexpected" and the idea of "quick." *Id.* at 621.

The facts of *Murray* virtually mirror the facts at bar. In *Murray*, the United States filed suit under CERCLA against an owner of a hazardous waste site and four companies that contracted with the site for disposal of their waste for response and clean-up costs. *Id.* at 618. The four defendant companies then filed a third-party complaint against Murray Ohio, seeking contribution for the amount of any judgment that was rendered in the original suit. *Id.* Murray Ohio's insurer denied coverage. The insurer filed a suit for declaratory judgment, arguing that it was not obligated to defend or indemnify Murray Ohio due to the pollution exclusion clause contained in the policy. *Id.* at 619. The primary issue in the case was whether the contamination that occurred resulted from the "sudden and accidental" dispersion of hazardous substances.

Murray Ohio argued that "sudden" should not be construed as having any temporal aspect, but rather, should be construed as meaning "unexpected," "unforeseen," or "fortuitous." *Id.* at 619. According to Murray Ohio, liability coverage would be required under the policy for "all *unintended results* of an insured party's intentional acts, excluding coverage only for *intended results* of intentional acts." *Id.*

The court rejected Murray Ohio's argument. *Id.* at 621. The court first noted that it found no ambiguity in either the exclusion clause or the term "sudden." *Id.* The court then stated:

> The common sense meaning in everyday parlance of the term 'sudden' combines both the idea of 'unexpected,' and the idea of 'quick.' Because the Policy does not otherwise define 'sudden,' the Court is unwilling to read out of this word the temporal connotation that it possesses in its everyday use.

*Id.*

The court ruled that coverage applied only if the release was "sudden and accidental, that is occurring both unexpectedly and relatively quickly in time." *Id.* Because in *Murray*, the waste had been transported and disposed at the site for approximately six years, and there was no evidence of a breakdown, leak, or other "sudden" event, the court held that the pollution was not "sudden," and thus, the insurer had no duty either to defend or indemnify Murray Ohio. *Id.* at 622–23. In an unpublished disposition, the Sixth Circuit Court of Appeals affirmed the lower court's decision in *Murray*. *Murray*, 875 F.2d 868 (6th Cir.1989).

Similarly, in *Osco, Inc. v. St. Paul Fire and Marine Ins. Co.*, 656 N.E.2d 548 (Ind.Ct. App.1995), the Indiana court of appeals held that under Tennessee law, the insurer had no duty to defend or indemnify its insured because the contamination occurred over a period of years. *Id.* at 550. The court relied on *Murray* in holding that Tennessee law would interpret "sudden" as possessing a temporal element. *Id.* at 549.

Several Sixth Circuit decisions have adopted the same position as that of the *Murray* court—that "sudden" incorporates a temporal element. *See, e.g., Transamerica*, 50 F.3d 370; *Star Fire*, 856 F.2d 31; *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98 (6th Cir.1995); *Harrow Products, Inc. v. Liberty Mut. Ins. Co.*,

4. *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083 (Colo.1991); *Claussen v. Aetna Cas. & Sur. Co.*, 259 Ga. 333, 380 S.E.2d 686 (1989); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992); *Morton Int'l. Inc. v. General Acc. Ins. Co.*, 134 N.J. 1, 629 A.2d 831 (1993), cert. denied, —— U.S. ——, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994); *Queen City Farms v. Central Nat'l Ins. Co. of Omaha*, 126 Wash.2d 50, 882 P.2d 703 (1994); *Joy Technologies, Inc., v. Liberty Mut. Ins. Co.*, 187 W.Va. 742, 421 S.E.2d 493 (1992); *Just v. Land Reclamation, Ltd.*, 155 Wis.2d 737, 456 N.W.2d 570 (1990).

64 F.3d 1015 (6th Cir.1995). For example, the Sixth Circuit Court of Appeals stated in *Star Fire:*

> We believe the everyday meaning of the term 'sudden' is exactly what this clause means. We do not believe that it is possible to define 'sudden' without reference to a temporal element that joins together conceptually the immediate and the unexpected. It must also be emphasized that the focus of this 'sudden and accidental' exception to the general pollution exclusion clause is on the nature of the discharge of the pollution itself, not on the nature of the damages caused.

*Star Fire,* 856 F.2d at 34.

 After having reviewed cases that elected to take an alternate interpretive path, we are persuaded by the holdings and rationales of those cases following the majority position, which is that the proper interpretation of the term "sudden" necessarily includes a temporal element. Contracts of insurance are to be interpreted like other contracts according to the usual, natural, and ordinary meaning of the language employed. *American Nat'l. Property & Cas. Co. v. Gray,* 803 S.W.2d 693, 696 (Tenn.App.1990). We find that the usual, natural, and ordinary meaning of "sudden" is "abrupt"—the opposite of "gradual," "routine," or "continuous." *See, Hartford Accid. & Indem. Co. v. U.S. Fidelity and Guaranty Co.,* 962 F.2d 1484, 1489 (10th Cir.1992), *cert. denied,* 506 U.S. 955, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992).

The standard GCL policy excludes coverage for claims arising from pollution damage unless the discharge of the pollutants was "sudden and accidental." Because "accidental" generally means unexpected or unintended,[5] to construe "sudden" to mean the same would be completely redundant. *Charter Oil Co. v. American Employers' Ins. Co.,* 69 F.3d 1160 (D.C.Cir.1995); *Northern Ins. Co. v. Aardvark Assocs., Inc.,* 942 F.2d 189, 192 (3rd Cir.1991). Such an interpretation would render the term "sudden" without independent significance because the word "accidental" necessarily implies unexpectedness. *Aetna Cas. & Sur. Co. v. General Dynamics Corp.,* 968 F.2d 707 (8th Cir.1992). It is evident that in order for coverage to be reinvoked, the discharge must have been both "sudden" **and** "accidental." Both of these independent requirements must be satisfied.[6]

We believe the proper rule to be applied, therefore, is as follows: When discharges of pollution occur on a regular, ongoing basis over a lengthy period of time as a normal part of an operation, such discharges are not "sudden" within the meaning of the pollution exclusion clause. However, where the damage is caused by a "few discrete polluting events, each of which was short in duration and accidental in nature," the discharge will fall within the "sudden and accidental" exception to the pollution exclusion and, therefore, the insurer will be liable for coverage under the policy. *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.,* 905 F.2d 954, 957 (6th Cir.1990).

We reject appellant's contention that the phrase "sudden and accidental" is ambiguous. In doing so, we agree with one court's observation that this "language is clear and plain, something only a lawyer's ingenuity could make ambiguous." *American Motorists Ins. Co. v. General Host Corp.,* 667 F.Supp. 1423 (D.Kan.1987), *aff'd,* 946 F.2d 1482 (10th Cir.1991). As stated by our Supreme Court:

> It is the duty of the Court, where there is no ambiguity, to take the ordinary meaning of the words used, favoring neither party in their construction. Creation of an ambiguity where none exists is not authorized by the rule requiring construction of the language of an insurance policy most strongly against the insurance company.

---

5. *St. Paul Fire & Marine Ins. Co. v. Northern Grain Co.,* 365 F.2d 361, 364 (8th Cir.1966) ("[T]he courts are practically agreed that the words 'accident' and 'accidental' mean that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual, and unforeseen.")

6. *Accord, Smith v. Hughes Aircraft Co.,* 22 F.3d 1432 (9th Cir.1994); *Northern Ins. Co. v. Aardvark Assoc. Inc.,* 942 F.2d 189 (3rd Cir.1991).

*Winecoff v. Nationwide Mutual Ins. Co.,* 223
Tenn. 267, 444 S.W.2d 84, 86–87 (1969).

### B. *Conclusions of Law*

In assessing the evidence supporting a motion for summary judgment, we must review the matter in a light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Carvell v. Bottoms,* 900 S.W.2d 23, 26 (Tenn. 1995). The standard governing this court's review of a trial court's grant of summary judgment is confined to a review of whether the requirements of Tenn.R.Civ.P. 56 have been satisfied. As stated by the Tennessee Supreme Court in *Carvell:*

> Tenn.R.Civ.P. 56.03 provides that summary judgment is only appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn.1993); and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. *Anderson v. Standard Register Co.,* 857 S.W.2d 555, 559 (Tenn.1993). The moving party has the burden of proving that is motion satisfied these requirements. *Downen v. Allstate Ins. Co.,* 811 S.W.2d 523, 524 (Tenn.1991).

*Id.* at 26.

Because we have determined that "sudden" includes both a temporal element and a sense of the unexpected, we must measure these standards against the evidence regarding the pollution-causing events alleged to have occurred at the ABPC site. In evaluating whether there remains a genuine issue of material fact as to whether the pollution was "sudden and accidental," we have before us the pleadings filed in this matter, the original pleadings filed in the EPA suit, and the deposition testimony of William Bell, president of ABPC.

Bell testified in his deposition that the only product that ABPC formulated for Drexel was maleic hydrazide, which is a growth regulator used on tobacco to strip off the suckers located on the bottom of the tobacco. The maleic hydrazide was formulated in a 14,000 gallon "blending tank." Initially, the blending tank was used only for formulating

maleic hydrazide, but was later used for more toxic chemicals.

Bituminous argues that the 14,000–gallon blending tank in which the maleic hydrazide was formulated was an outdoor earthen pit with no side walls. According to Bituminous, ABPC's routine blending of chemicals in an open dirt pit constituted intentional behavior of an ongoing nature and thus, any spills or leaks could not have been "sudden or accidental." In support of their argument, Bituminous has directed us solely to the following portion of Bell's deposition:

Q: You used the word today 'Adavex' in talking about materials that were later blended in the tank which I believe has been marked on Exhibit 1 to your deposition—Will you again identify the tank that we are talking about?

A: It is the 14,000–gallon tank.

 * * * * * *

Q: Was it in a concrete containment area?

A: It was in a 14 by 14 by 14 deep pit with a cover. No walls, but a metal cover over the tank.

We find Bituminous' contention to be without merit. A thorough examination of the 600–page deposition reveals that Bell described the blending tank as a tank supported by legs that was placed in a concrete hole in the ground and was not, as Bituminous alleges, an open dirt pit in the ground.

Pertinent portions of Bell's deposition testimony relating to the blending tank are as follows:

Q: What sort of opening was there in the tank to do that?

A: I don't remember what size the opening was, but it was like, you know, a three foot or two foot opening, something of that type. The tank was also covered with a structure above it. But it was an open sided structure over the tank.

Q: Just a roof over it?

A: A roof over it, right, a metal roof.

Q: What was the blending tank sitting on?

A: It was sitting in a hole in the ground. It was a 20–inch concrete pad with, I think, 14–inch sides, sitting on—in the ground on legs in this hole.

Q: The bottom of the hole was concrete?

A: Yes.

Q: And up the sides was concrete?

A: Was concrete, right. And the concrete came up above the ground also.

Q: Was there any kind of opening or drain in that concrete floor?

A: No, there was not.

Reading from a report that Bell prepared and sent to the state of Tennessee, Bell stated:

A: Okay. 'Area K is where the bulk of our liquid chemicals are made. The tank in the pit that is 14 feet deep . . .'

Although we reject Bituminous' contention that the pollution was effectuated intentionally, we nevertheless conclude from the record that the pollution was not "sudden."

The complaint filed in the underlying action by the United States alleges as follows:

13. While Arlington Blending was engaged in the formulation and packaging of pesticide product it deposited, dumped, placed, spilled and otherwise disposed of a variety of chemical waste on the Arlington Blending site. . . .

14. At various times relevant herein, Arlington Blending stored drums containing chemicals at the Arlington Blending site. "Losses" of some of the chemicals from the drums, constituted chemical wastes, occurred by spilling or leaking. . . .

17. At the Arlington Blending site, EPA collected the solid and liquid chemical wastes and transported them to EPA approved sites for disposal . . . A concrete pit filled with debris and contaminated water was emptied. . . .

With respect to the nature of the discharges that occurred, Bell testified:

A: There is small spills and leaks from equipment when you disconnect. That is part of any operation.

\* \* \* \* \* \*

A: The other way that the chemicals got on the ground was simply by, you know, movement in and out of building and all.

\* \* \* \* \* \*

A: The question is kind of hard for me to answer. I mean, I don't assume that the spills are going to occur. However, I do think that measures should be set up to prevent them or to contain them.

\* \* \* \* \* \*

Q: Now, Arlington Blending and Packaging Company never had a major spill, did they?

A: In that time period, no. We did have a spill as I mention of the Dimethoate which blew from a couple of drums. So as today's standards that would have been considered major. That was the only one.

\* \* \* \* \* \*

Q: In your opinion was it inevitable that there would be drips and drops when you were loading chemicals?

A: There were always drips when we were handling processing chemicals and we tried to take measures to captures [sic] those drips.

\* \* \* \* \* \*

A: Okay. 'Area K is where the bulk of our liquid chemicals are made. The tank in the pit that is 14 feet deep. The spills around this area fall into the pit and were pumped onto the wall or walk and then later pumped across the railroad tracks.'

\* \* \* \* \* \*

Q: So, by your statements in those two sentences that you just read, any material spilled from that tank would have been—at that time, was pumped out into a ditch across from the railroad tracks?

A: That is correct. That was the Maleic Hydrazide steam tramp tank. They make hydrazide and sucker agents. That is what it was designed to take the waste from that product.

■ The undisputed facts establish that the contamination found by the EPA resulted from numerous spills and leaks that occurred in the regular operation of the ABPC facility over the course of several years. Thus, Bitu-

minous has met its burden of establishing that the alleged pollution falls within the policy's pollution exclusion clause. Because these releases were commonplace events that occurred in the regular course of business, they cannot be deemed "sudden and accidental." Accordingly, we hold that Bituminous has no duty to indemnify Drexel in this case.

■ An insurer's duty to defend is separate and distinct from the insurer's obligation to pay claims under the policy. *Jackson Housing Authority v. Auto–Owners Ins. Co.,* 686 S.W.2d 917 (Tenn.App.1984). The duty to defend is broader than the duty to indemnify. This court must review the allegations of the complaint and determine whether any of them are covered under the policy. If even one of the allegations is covered by the policy, the insurer has a duty to defend, irrespective of the number of allegations that may be excluded by the policy. *U.S. Fidelity & Guar. Co. v. Murray Ohio Manuf. Co.,* 693 F.Supp. 617 (M.D.Tenn.1988). An insurer may not properly refuse to defend an action against its insured unless "it is plain from the face of the complaint that the allegations fail to state facts that bring the case within or potentially within the policy's coverage." *Glens Falls Ins. Co. v. Happy Day Laundry, Inc.,* 19784 T.V., 1989 WL 91082 (Tenn.App. August 14, 1989).

The Court in *St. Paul Fire and Marine Ins. Co. v. Torpoco,* 879 S.W.2d 831 (Tenn. 1994), stated the applicable rule as follows:

> It is accepted in the overwhelming majority of jurisdictions that the obligation of a liability insurance company to defend an action brought against the insured by a third party is to be determined solely by the allegations contained in the complaint in that action.... Accordingly, if the allegations ... are within the risk insured against and there is a potential basis for recovery, then [the insurer] must defend ..., regardless of the actual facts or the ultimate grounds on which ... liability to the injured parties may be predicated.... In any event, the pleading test for determination of the duty to defend is based exclusively on the facts as alleged rather than on the facts as they actually are....

*Id.,* at 835 (quoting *American Policyholders' Ins. Co. v. Cumberland Cold Storage Co.,* 373 A.2d 247 (Me.1977)).

■ Thus, the scope of our inquiry in determining whether Bituminous possesses a duty to defend is confined to the averments of the pleadings. *Graves,* 745 S.W.2d at 283; *First National Bank in Bristol v. South Carolina Ins. Co.,* 207 Tenn. 520, 341 S.W.2d 569 (1960).

The third-party complaint filed against Drexel alleges that between 1971 and 1975, Drexel and other defendant companies contracted with ABPC for the formulation of various chemical products that contained hazardous substances. The complaint further alleges that wastes generated during the formulating process contained hazardous substances that were treated or disposed of at ABPC and thereby contaminated the site with hazardous substances.

After reviewing the allegations of the complaint, we are of the opinion that Bituminous has no duty to defend Drexel in the underlying litigation. The pollution is alleged to have occurred over a period of four years during the regular course of ABPC's business of formulating, treating, and disposing of chemicals. In accordance with our previous discussion, this type of activity cannot be deemed "sudden" within the meaning of the pollution exclusion clause.

The judgment of the trial court is hereby affirmed. Costs on appeal are taxed to appellant, for which execution may issue if necessary.

LILLARD, J., and TOMLIN, Senior Judge concur.