# SULPHURIC ACID TRADING CO., INC.

v.

# GREENWICH INSURANCE COMPANY, et al.

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

May 24, 2006 Session.

July 31, 2006.

Permission to Appeal Denied by Supreme Court Dec. 18, 2006.

Joel J. Henderson and Edward D. Lamar, Greenville, Mississippi, and David F. Hensley, Chattanooga, Tennessee, for the appellant, Sulphuric Acid Trading Company, Inc.

Michael E. Richardson, Chattanooga, Tennessee, for the appellee, Xavier Chemical Company.

Charles Platto and Sarah Shelburne North, Norwich, Vermont, and Shelby Grubbs, Leah Gerbitz, and Robert F. Parsley, Chattanooga, Tennessee, for the appellee, Greenwich Insurance Company.

**OPINION**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

The plaintiff, Sulphuric Acid Trading Company, Inc., ("the Owner"), entered into an agreement with the defendant, Xavier Chemical Company ("the Loading Company"), by the terms of which the Loading Company was to transload the Owner's product, sulphuric acid, from railcars to tanker trucks. The Loading Company subcontracted with Bulkmatic Transport, Inc., to accomplish the transfer of the sulphuric acid for subsequent distribution to the Owner's customers. James Gregory Johnson was employed by Bulkmatic and

was in the process of transferring the sulphuric acid when a transloading coupling on top of the rail tank car allegedly broke. Approximately 1,800 gallons of sulphuric acid were sprayed into the air and onto the surrounding area. Johnson was severely injured when the sulphuric acid was sprayed on his face and body. The Loading Company was insured under a comprehensive general liability policy issued by the defendant Greenwich Insurance Company ("the Insurance Company"). After Johnson sued Owner and the Loading Company, the Owner filed a declaratory judgment action against the Insurance Company asserting that Johnson's claims were covered under the policy. The suit also named the Loading Company as a defendant. The trial court granted the Insurance Company's motion for summary judgment, finding that the Absolute Pollution Exclusion in the policy excluded coverage for Johnson's claims. The Loading Company and the Owner appeal. We affirm.

## I.

The underlying facts are not in dispute. The Owner was the owner of the sulphuric acid involved in this case. The Owner and the Loading Company entered into a "terminaling" agreement pursuant to which the Loading Company was to transload sulphuric acid from railcars to tanker trucks for storage at a former U.S. Army post. The Loading Company had not completed renovations to its storage location when the first shipment of sulphuric acid arrived. As a consequence, the Loading Company had to subcontract with Bulkmatic Transport, Inc., to make the transfer of the sulphuric acid.

Johnson was employed by Bulkmatic. On January 3, 2001, Johnson was involved in transferring sulphuric acid to a tanker truck when, according to Johnson, the transloading coupling on top of the rail tank car broke. Approximately 1,800 gallons of sulphuric acid were sprayed into the air and onto the surrounding property. The sulphuric acid was expelled as high as 26 feet in the air; it was said to be comparable to an uncapped fire hydrant. The sulphuric acid sprayed Johnson's face and body causing significant injuries. An employee of Bulkmatic gave deposition testimony that the environmental cleanup cost was in the range of $100,000.

Johnson filed suit against several entities, including the Owner and the Loading Company. Johnson claimed, among other things, that both the Owner and the Loading Company negligently failed to inspect the equipment and failed to adequately warn of potential hazards. The Owner was eventually granted summary judgment in the lawsuit filed by Johnson.

The Loading Company was the named insured in a comprehensive general liability policy issued by the Insurance Company. The Insurance Company denied coverage for Johnson's claims based upon an "Absolute Pollution Exclusion" contained in the insurance policy. This exclusion provides, in relevant part, as follows:

### ABSOLUTE POLLUTION EXCLUSION—COMMERCIAL GENERAL LIABILITY (OCCURRENCE)

\* \* \*

It is ... understood and agreed that this endorsement shall be applicable to all coverages set forth in this policy or appended by endorsement thereto, including but not limited to COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY....

This insurance shall not apply to:

(1) "Bodily injury", "property damage", "personal injury", or "advertising injury" which would not have occurred in

whole or in part but for the actual, alleged, possible, or threatened, intentional or unintentional, discharge, disposal, dispersal, seepage, migration, release or escape of pollutants; or

(2) "Bodily injury", "property damage", "personal injury", or "advertising injury" arising out of or in any way related to exposure to pollutants, including but not limited to the inhaling or ingesting of pollutants; or

(3) Any loss, cost or expense arising out of or in any way related to any request, demand, order, directive, complaint or "suit" by or on behalf of any person, group of persons or entity, including any governmental entity, that any insured or any other person, group of persons or entity test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess pollutants or the effects of pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, *acid*, alkalis, *chemicals* and waste. Waste includes material to be recycled, reconditioned or reclaimed.

(Bold print and capitalization in original; emphasis added).

After the Insurance Company denied coverage pursuant to the above exclusion, the Owner brought a declaratory judgment action seeking a declaration that the incident involving Johnson was covered under the policy. The Owner contends that it is an additional insured under the policy. The Loading Company sought both indemnification and defense costs incurred in connection with the lawsuit filed by Johnson. Since it was granted summary judgment in Johnson's lawsuit, the Owner is seeking only its defense costs.

The trial court entered an order granting the Insurance Company's motion for summary judgment. As relevant to this appeal, the order provides as follows:

It is the contention of [the Insurance Company] that this language [in the Absolute Pollution Exclusion] is clear and unambiguous and excludes any coverage for damages arising out of the lawsuit [filed by Johnson]. It is the contention of [the Loading Company and the Owner] that the language is inherently ambiguous and, therefore, is to be construed against the insurance carrier who drafted the agreement.

The Court has reviewed the cases which find the coverage ambiguous as well as those which find the exclusion is unambiguous and binding on the parties. The Court recognizes that exclusions in insurance contracts will be liberally interpreted in favor of the insured against the insuror if ambiguous. *Sturgill v. Life Insurance Company of Georgia*, 62 Tenn.App. 550, 465 S.W.2d 742 (Tenn. App.1970). The Court further recognizes it is to determine whether there is any material issue of law or fact which would preclude entry of the summary judgment. *Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993). The Court further recognizes that some courts have adopted the "reasonable expectation" doctrine, applied it to the Absolute Pollution Exclusion, and held the exclusion not enforceable. *Atlantic Mutual Insurance Company v. McFadden*, 413 Mass. 90, 595 N.E.2d 762 (1992).

This Court finds no ambiguity in the exclusion as applied to the instant case. The exclusion clearly applies to bodily injury or personal injury such as that suffered by James Gregory Johnson. This incident occurred because of the unintentional discharge or release or escape of a pollutant as defined by the contract, sulphuric acid. The definition of pollutant specifically includes acid. [The Owner] argues that sulphuric acid is not an acid within the definition of the policy. The Court is precluded from

creating an ambiguity in an insurance contract where none exists and giving to words meanings other than those ordinarily understood. *American National Property & Casualty v. Gray*, 803 S.W.2d 693 (Tenn.Ct.App.1990). An ordinary person clearly would understand sulphuric acid to be an acid within the terms and provisions of the policy. Further, the incident giving rise to the case before the Court involved the unintentional discharge or release of a large quantity of sulphuric acid which is a pollutant by the contractual definition. Accordingly, the Court rejects the arguments made against the motion for summary judgment and grants summary judgment on the basis of the pollution exclusion contract.

Summary judgment also is sought on the basis that under the findings of Judge Thomas [in the underlying lawsuit by Johnson, the Owner] is not an additional insured under the vendor's endorsement as [the Owner] is not a seller or distributor of [the Loading Company's] products. Rather, [the Owner] was the distributor and owner of the product.[1] Therefore, the vendor's endorsement does not apply.... Accordingly, judgment is entered in behalf of [the Insurance Company] on all claims....

(Footnote added).

## II.

The Owner appeals, generally claiming the trial court erred when it granted the Insurance Company's motion for summary judgment. The Owner more specifically argues that the trial court erred when it concluded the Absolute Pollution Exclusion was applicable to the personal injuries suffered by Johnson while transferring the sulphuric acid. The Owner's third issue is its claim that the trial court erred when it concluded the Owner was not an additional insured under the insurance policy. The Loading Company likewise claims the trial court erred in granting the Insurance Company's motion for summary judgment for the same reasons set forth by the Owner. However, the Loading Company also maintains that summary judgment was not appropriate as to it because, so the argument goes, there are genuine issues of material fact regarding whether the Loading Company, pursuant to the insurance policy, had a reasonable expectation that it would be afforded a defense and indemnification with respect to Johnson's claims.[2]

## III.

In *Teter v. Republic Parking System, Inc.*, 181 S.W.3d 330 (Tenn.2005), the Supreme Court recently reiterated the standards applicable when appellate courts are reviewing the granting of a motion for summary judgment. The High Court stated:

The purpose of summary judgment is to resolve controlling issues of law rather

---

1. The findings by Judge Thomas were that the Owner "was the distributor and the owner of the acid, distributing the acid through [the Loading Company] and Bulkmatic to ECI, the trucking firm transporting the acid to the customer." Judge Thomas later stated that the Owner "was the owner and distributor of the sulphuric acid in question and contracted with [the Loading Company] for the transloading of the product."

2. Because the Owner filed its notice of appeal first, it was designated as the appellant and the other parties, including the Loading Company, were designated as appellees. Irrespective of their designation as appellant and appellee, both the Owner and the Loading Company are challenging the grant of summary judgment to the Insurance Company.

than to find facts or resolve disputed issues of fact. *Bellamy v. Fed. Express Corp.*, 749 S.W.2d 31, 33 (Tenn.1988). Summary judgment is appropriate only when the moving party demonstrates that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04; *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn.1993). In reviewing the record, the appellate court must view all the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn.2000). And because this inquiry involves a question of law only, the standard of review is de novo with no presumption of correctness attached to the trial court's conclusions. *See Mooney v. Sneed*, 30 S.W.3d 304, 306 (Tenn.2000); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995).

*Teter*, 181 S.W.3d at 337. Issues involving an insurance policy's coverage and an insurance company's duty to defend require "the interpretation of the insurance policy in light of claims asserted against the insured." *Allstate Ins. Co. v. Jordan*, 16 S.W.3d 777, 779 (Tenn.Ct.App.1999). These issues present a question of law which can be resolved by summary judgment when the relevant underlying facts are not in dispute. *Id.* (citing *Standard Fire Ins. Co. v. Chester O'Donley & Assoc.*, 972 S.W.2d 1, 5–6 (Tenn.Ct.App. 1998)).

## IV.

### A.

The parties and this Court have been unable to locate any Tennessee authority discussing the Absolute Pollution Exclu-sion contained in comprehensive general liability policies such as the one at issue in the present case. However, the Absolute Pollution Exclusion has generated many reported decisions from other jurisdictions. For example, in *American States Ins. Co. v. Koloms*, 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72 (1997), the plaintiffs were employees of a commercial tenant who were injured when a furnace in the building began to emit carbon monoxide fumes. In deciding whether the Absolute Pollution Exclusion contained in the landlord's comprehensive general liability policy excluded coverage, the Illinois Supreme Court gave a very thorough discussion of the genesis and development of the Absolute Pollution Exclusion:

> The events leading up to the insurance industry's adoption of the pollution exclusion are "well-documented and relatively uncontroverted." *Morton International, Inc. v. General Accident Insurance Co.*, 134 N.J. 1, 31, 629 A.2d 831, 848 (1993). Prior to 1966, the standard-form CGL policy provided coverage for bodily injury or property damage caused by an "accident." *Center for Creative Studies v. Aetna Life & Casualty Co.*, 871 F.Supp. 941, 943 n. 3 (E.D.Mich.1994), quoting J. Stempel, *Interpretation of Insurance Contracts: Law and Strategy for Insurers and Policyholders* 825 (1994). The term "accident," however, was not defined in the policy. As a result, courts throughout the country were called upon to define the term, which they often interpreted in a way as to encompass pollution-related injuries. In response, the insurance industry revised the CGL policy in 1966 and changed the former "accident"—based policy to an "occurrence"—based policy. The new policy specifically defined an "occurrence" as "an accident, including injurious exposure to condi-

tions, which results, during the policy period, in bodily injury and property damage that was neither expected nor intended from the standpoint of the insured." *Morton International, Inc.,* 134 N.J. at 32, 629 A.2d at 849 (and cases cited therein). Despite these changes, courts continued to construe the policy to cover damages resulting from long-term, gradual exposure to environmental pollution. As one court observed, "[s]o long as the ultimate loss was neither expected nor intended, courts generally extended coverage to all pollution-related damage, even if it arose from the intentional discharge of pollutants." *New Castle County v. Hartford Accident & Indemnity Co.,* 933 F.2d 1162, 1196–97 (3d Cir.1991). Meanwhile, at about the same time, the United States Congress substantially amended the Clean Air Act in an effort to protect and enhance the quality of the nation's air resources. Pub.L. No. 91–604, 84 Stat. 1676 (1970) (now codified at 42 U.S.C. §§ 7401 through 7642 (1983), as amended). The passage of these amendments, which included provisions for cleaning up the environment, imposed greater economic burdens on insurance underwriters, particularly those drafting standard-form CGL policies. *Westchester Fire Insurance Co. v. City of Pittsburg,* 768 F.Supp. 1463, 1469 n. 8 (D.Kan.1991), *aff'd,* 987 F.2d 1516 (10th Cir.1993). The insurer's burdens further increased with the relatively recent, and now well-publicized, environmental disasters of Times Beach, Love Canal and Torrey Canyon. *See Center for Creative Studies,* 871 F.Supp. at 944; see also *Morton International, Inc.,* 134 N.J. at 33–34, 629 A.2d at 850.

In the wake of these events, the insurance industry became increasingly concerned that the 1966 occurrence-based policies were "tailor-made" to cover most pollution-related injuries. *Morton International, Inc.,* 134 N.J. at 33, 629 A.2d at 850, quoting Note, *The Pollution Exclusion Clause Through the Looking Glass,* 74 Geo. L.J. 1237, 1251 (1986). To that end, changes were suggested, and the industry proceeded to draft what was to eventually become the pollution exclusion. The Supreme Court of New Jersey explained, "[f]oreseeing an impending increase in claims for environmentally-related losses, and cognizant of the broadened coverage for pollution damage provided by the occurrence-based, CGL policy, the insurance industry drafting organizations began in 1970 the process of drafting and securing regulatory approval for the standard pollution-exclusion clause." *Morton International, Inc.,* 134 N.J. at 32, 629 A.2d at 849–50. Consequently, the General Liability Governing Committee of the Insurance Rating Board instructed its drafting committee "to consider the question and determine the propriety of an exclusion, having in mind that pollutant-caused injuries were envisioned to some extent in the adoption of the current [policies]." *Morton International, Inc.,* 134 N.J. at 34, 629 A.2d at 850, quoting T. Reiter, D. Strasser & W. Pohlman, *The Pollution Exclusion Under Ohio Law: Staying the Course,* 59 U. Cin. L.Rev. 1165, 1197 (1991).

The result of these efforts was the addition of an endorsement to the standard-form CGL policy in 1970. The endorsement provided in pertinent part:

"[This policy shall not apply to bodily injury or property damage] arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmo-

sphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

Three years later, in 1973, the insurance industry incorporated the above endorsement directly into the body of the policy as exclusion "f."

During the next 13 years, various courts labored over the exact meaning of the words "sudden and accidental." [3] Much of the litigation focused on whether the word "sudden" was intended to be given a strictly temporal meaning such that, in order for the exception to apply, the discharge of pollution had to have been "abrupt." See *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992). This controversy generated an enormous amount of litigation, leading one commentator to describe the dispute as one of "the most hotly litigated insurance coverage questions of the late 1980's." J. Stempel, *Interpretation of Insurance Contracts: Law and Strategy for Insurers and Policyholders* 825 (1994), quoted in *Center for Creative Studies*, 871 F.Supp. at 943. Not surprisingly, insurance companies responded by drafting a new version of the exclusion, which, first appearing in 1985, is now commonly known as the "absolute pollution exclusion." ... The two most notable features of this latest version are (i) the lack of any exception for the "sudden and accidental" release of pollution, and (ii) the elimination of the requirement that the pollution be discharged "into or upon land, the atmosphere or any watercourse or body of water." See *Weaver v. Royal Insurance Co. of America*, 140 N.H. 780, 674 A.2d 975 (1996). Significantly, the purpose of the current exclusion, like its predecessor, is "to exclude governmental clean up costs from [the scope of] coverage." *West American Insurance Co. v. Tufco Flooring East, Inc.*, 104 N.C.App. 312, 324, 409 S.E.2d 692, 699 (1991).

Our review of the history of the pollution exclusion amply demonstrates that the predominate motivation in drafting an exclusion for pollution-related injuries was the avoidance of the "enormous expense and exposure resulting from the 'explosion' of *environmental* litigation." ... *Weaver*, 140 N.H. at 783, 674 A.2d at 977, quoting *Vantage Development Corp. v. American Environment Technologies Corp.*, 251 N.J.Super. 516, 525, 598 A.2d 948, 953 (1991). Similarly, the 1986 amendment to the exclusion was wrought, not to broaden the provision's scope beyond its original purpose of excluding coverage for environmental pollution, but rather to remove the "sudden and accidental" exception to coverage which, as noted above, resulted in a costly onslaught of litigation. We would

---

**3.** In *Drexel Chemical Co. v. Bituminous Ins. Co.*, 933 S.W.2d 471 (Tenn.Ct.App.1996), this Court discussed the "sudden and accidental" language which existed before the dawn of the Absolute Pollution Exclusion. We determined that insurance coverage properly was denied in that case:

> When discharges of pollution occur on a regular, ongoing basis over a lengthy period of time as a normal part of an operation, such discharges are not "sudden" within the meaning of the pollution exclusion

clause. However, where the damage is caused by a "few discrete polluting events, each of which was short in duration and accidental in nature," the discharge will fall within the "sudden and accidental" exception to the pollution exclusion and, therefore, the insurer will be liable for coverage under the policy.

*Id.* at 477 (citing *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.*, 905 F.2d 954, 957 (6th Cir.1990)).

be remiss, therefore, if we were to simply look to the bare words of the exclusion, ignore its *raison d' etre*, and apply it to situations which do not remotely resemble traditional environmental contamination. The pollution exclusion has been, and should continue to be, the appropriate means of avoiding " 'the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances *into the environment.*' " (Emphasis in original.) *Tufco,* 104 N.C.App. at 323, 409 S.E.2d at 699, quoting *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.,* 315 N.C. 688, 698, 340 S.E.2d 374, 381 (1986). We think it improper to extend the exclusion beyond that arena.

*Koloms,* 227 Ill.Dec. 149, 687 N.E.2d at 79–81 (original footnotes omitted; emphasis in original; footnote No. 3 added). The Court then concluded that the "accidental release of carbon monoxide in this case, due to a broken furnace, does not constitute the type of environmental pollution contemplated by the clause." *Id.* at 82.[4]

### B.

■ Recent cases discussing the Absolute Pollution Exclusion demonstrate two distinct views on the scope of the exclusion. In *MacKinnon v. Truck Ins. Exchange,* 31 Cal.4th 635, 3 Cal.Rptr.3d 228, 73 P.3d 1205 (2003), the California Supreme Court concluded that the Absolute Pollution Exclusion did not preclude coverage for a claim based upon the landlord's alleged liability for a tenant's death resulting from the negligent spraying of pesticides to kill yellow jackets at an apartment building. In so holding, the *MacKinnon* Court stated as follows:

The meaning of the current pollution exclusion has not received wide attention in this state. However, the scope of the exclusion has been litigated extensively in other jurisdictions. To say there is a lack of unanimity as to how the clause should be interpreted is an understatement. Although the fragmentation of opinion defies strict categorization, courts are roughly divided into two camps. One camp maintains that the exclusion applies only to traditional environmental pollution into the air, water, and soil, but generally not to all injuries involving the negligent use or handling of toxic substances that occur in the normal course of business. These courts generally find ambiguity in the wording of the pollution exclusion when it is applied to such negligence and interpret such ambiguity against the insurance company in favor of coverage. The other camp maintains that the clause applies equally to negligence involving toxic substances and traditional environmental pollution, and that the clause is as unambiguous in excluding the former as the latter.

*MacKinnon,* 3 Cal.Rptr.3d 228, 73 P.3d at 1208, 1209. (Footnotes omitted).

In the instant case, the Owner and the Loading Company urge this Court to align itself with those jurisdictions finding coverage in cases "involving the negligent use or handling of toxic substances that occur in the normal course of business." *See MacKinnon,* 3 Cal.Rptr.3d 228, 73 P.3d at 1208, 1209. The Owner and the Loading Company argue that the facts of this case fall squarely within the quoted language from *MacKinnon.* The Owner and Loading Company argue that the Absolute Pollution Exclusion should be held to apply

**4.** One Justice dissented, stating the majority chose "to override the clear language of the insurance contract" in an attempt to "divine

the unstated intent of the parties." *Koloms,* 227 Ill.Dec. 149, 687 N.E.2d at 82.

only to classic environmental pollution, which they claim does not include sulphuric acid. The Owner and Loading Company rely on cases such as *Gainsco Ins. Co. v. Amoco Production Co.*, 53 P.3d 1051 (Wyo. 2002). One of the issues in *Gainsco* was whether an Absolute Pollution Exclusion excluded coverage for a claim involving an employee who died from poisonous hydrogen sulfide gas while emptying a vacuum truck in an oil field. *Id.* at 1054. The Wyoming Supreme Court concluded that the exclusion did not apply, stating:

> We cannot believe that any person in the position of the insured would understand the word "pollution" in this exclusion to mean anything other than environmental pollution.... We do not know if it is the majority position, but we will join with those courts that have held the total pollution exclusion to be limited to the concept of environmental pollution.

*Id.* at 1066. The *Gainsco* Court cited numerous cases in support of its conclusion. Quoting directly from that opinion, those cases and holdings are as follows:

> *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 31 (1st Cir.1999) (reasonable interpretation of exclusion is that it applies only to environmental pollution); *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co., Ltd.*, 132 F.3d 526, 530 (9th Cir. 1997) (exclusion's reference to "seepage, pollution and contamination" indicates environmental-type harm); *Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir.1992) (literal interpretation of pollution exclusion's terms would be overbroad and would render judicial limitations on insurance policies meaningless); *Keggi v. Northbrook Property and Cas. Ins. Co.*, 199 Ariz. 43, 13 P.3d 785, 791 (2000) (exclusion intended only to exclude coverage for traditional environmental pollution); *Koloms*, 227 Ill.Dec. 149, 687 N.E.2d at 81 (pollution exclu-

sion does not apply to "toxic torts" but is restricted to. instances of classic pollution such as groundwater or soil contamination from industrial operations); *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 680–82 (Ky.App.1996) (total pollution exclusion uses terminology from environmental law and the historical objective of the exclusion was to avoid coverage for environmental catastrophes); *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 135 (La.2000), *corrected*, 782 So.2d 573 (La.2001) (absolute pollution exclusion not intended to exclude coverage for all interactions with irritants or contaminants and should be construed to exclude coverage only for environmental pollution); *Atlantic Mut. Ins. Co. v. McFadden*, 413 Mass. 90, 595 N.E.2d 762, 764 (1992) (pollution exclusion's terms are terms of art in environmental law); *Weaver v. Royal Ins. Co. of America*, 140 N.H. 780, 674 A.2d 975, 977 (1996) (where phrase "discharge, dispersal, release or escape" was not defined, it should be construed against the insurer); *Karroll v. Atomergic Chemetals Corp.*, 194 A.D.2d 715, 600 N.Y.S.2d 101, 102 (1993) (exclusion reasonably interpreted to apply only to environmental pollution); *West American Ins. Co. v. Tufco Flooring East, Inc.*, 104 N.C.App. 312, 409 S.E.2d 692, 699 (1991), *overruled on other grounds by Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 524 S.E.2d 558 (2000) (terms such as "discharge, dispersal, release, or escape" are environmental terms of art meant to apply to environmental pollution); and *Kent Farms, Inc. v. Zurich Ins. Co.*, 93 Wash.App. 414, 969 P.2d 109, 111–12 (1998), *aff'd*, 140 Wash.2d 396, 998 P.2d 292 (2000) (reasonable reading of the exclusion limits it to traditional environmental damages).

*Gainsco*, 53 P.3d at 1065, 1066.

The Insurance Company argues that it does not matter which line of reasoning

this Court adopts because this case involves nothing short of environmental pollution and an injury which occurred as a result of that pollution. In other words, the Insurance Company argues that the Absolute Pollution Exclusion would apply under both of these otherwise divergent lines of cases. Alternatively, the Insurance Company argues that this Court should align itself with the jurisdictions holding that the Absolute Pollution Exclusion applies "equally to negligence involving toxic substances and traditional environmental pollution, and that the clause is as unambiguous in excluding the former as the latter." *MacKinnon*, 3 Cal.Rptr.3d 228, 73 P.3d at 1209. Although the Court in *Gainsco, supra,* ultimately rejected the insurance company's argument, the Court acknowledged that there were numerous cases from other jurisdictions which supported the insurance company's position that the employee's death from hydrogen sulfide gas would be excluded from coverage pursuant to an Absolute Pollution Exclusion. According to *Gainsco,* these cases included:

> *Reliance Ins. Co. v. Moessner,* 121 F.3d 895, 901 (3rd Cir.1997) (exclusion does not require release of pollutant to the atmosphere and does not limit itself to environmental catastrophes); *American States Ins. Co. v. Nethery,* 79 F.3d 473, 475–78 (5th Cir.1996) (pollution exclusion encompasses more than traditional conceptions of pollution); *Toledo v. Van Waters & Rogers, Inc.,* 92 F.Supp.2d 44, 51–52 (D.R.I.2000) (plain and ordinary meaning of language of pollution exclusion precludes coverage even for non-environmental pollution); *American States Ins. Co. v. Technical Surfacing, Inc.,* 50 F.Supp.2d 888, 889–90 (D.Minn. 1999) (pollution exclusion not limited to environmental or outdoor pollution); *Brown v. American Motorists Ins. Co.,* 930 F.Supp. 207, 208–09 (E.D.Pa.1996),

*aff'd,* 111 F.3d 125 (3rd Cir.), *cert. denied,* 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997) (clear and unambiguous policy language shows no intent to limit pollution exclusion to environmental pollution); *TerraMatrix, Inc. v. United States Fire Ins. Co.,* 939 P.2d 483, 488 (Colo.App.1997) (plain language of pollution exclusion not limited to environmental or industrial pollution); *Lititz Mut. Ins. Co. v. Steely,* 746 A.2d 607, 612–13 (Pa.Super.1999), *rev'd on other grounds,* 567 Pa. 98, 785 A.2d 975 (2001) (pollution exclusion not limited to environmental pollution); *Madison Const. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 105 (1999) (no language in pollution exclusion limits its application to environmental pollution); and *Cook v. Evanson,* 83 Wash.App. 149, 920 P.2d 1223, 1226–27 (1996) (pollution exclusion not limited to classic environmental pollution).

*Gainsco,* 53 P.3d at 1065.

The parties to this appeal have submitted very thorough briefs. Each side makes compelling arguments. This much seems clear: the states which have decided the issue are fairly evenly split on whether the Absolute Pollution Exclusion pertains to "negligent use or handling of toxic substances that occur in the normal course of business." *MacKinnon,* 73 P.3d at 1208, 1209. Our review of the record in this case, however, persuades us that the facts of this case are such that we do not need to decide with which side Tennessee should be aligned. In the case at bar, the undisputed facts clearly demonstrate that Johnson was injured when *1,800 gallons of sulphuric acid* were sprayed into the air and onto the surrounding environment— an event that necessitated a clean-up costing some $100,000. The insurance policy specifically defines pollution to include "acid" and "chemicals." We reject the

Loading Company's argument that the accidental discharge of 1,800 gallons of sulphuric acid into the environment "is in no way related to environmental pollution." It would defy logic to hold that the discharge of 1,800 gallons of sulphuric acid into the environment was anything other than environmental pollution. We hold that these facts demonstrate the type of "classic environmental pollution" that would trigger the Absolute Pollution Exclusion under *either* of the two lines of reasoning adopted by the various states. While the facts before us do involve an employee injured in the course and scope of his employment, we must look at the big picture and cannot ignore the fact that the injury occurred during an event resulting in substantial environmental pollution. As applied to the facts of the instant case, we agree with the trial court that the Absolute Pollution Exclusion is not ambiguous. As to which of the two diverse lines of cases should be adopted in Tennessee, that decision must await another day and another case.

## C.

 The Loading Company argues that we should reverse the trial court because it was the Loading Company's reasonable expectation that the insurance policy would afford coverage "if there was some unintended accident involving its handling of the only product it handled, sulfuric acid." This argument would be much more persuasive if Johnson had been injured after a small amount of sulphuric acid spilled onto his body.[5] The true question is whether the Loading Company had a *reasonable*

expectation that there would be coverage under the policy when 1,800 gallons of sulphuric acid spewed out of a tanker truck, twenty-six feet into the air, covering the surrounding environment and, unfortunately, Johnson. As a matter of law, we do not believe that a person who reads the insurance policy and the Absolute Pollution Exclusion could in any way *reasonably* expect that the non-ambiguous terms of the policy would afford coverage for environmental pollution of this magnitude. *See American States Ins. Co. v. Skrobis Painting & Decorating, Inc.*, 182 Wis.2d 445, 513 N.W.2d 695, 697 (Wis.App.1994) (affirming the grant of summary judgment to an insurance company based upon an Absolute Pollution Exclusion and stating that, "as a matter of law, an insured cannot have a reasonable expectation of coverage when an unambiguous policy excludes coverage."); *Cincinnati Ins. Co. v. Becker Warehouse Inc.*, 262 Neb. 746, 635 N.W.2d 112, 120 (2001)(rejecting the argument that an Absolute Pollution Exclusion violated the insured's reasonable expectations, stating that the "reasonable expectations of an insured are not assessed unless the language of the insurance policy is found to be ambiguous. When the terms of the contract are clear, a court may not resort to rules of construction. . . ."). We note, in passing, that, while the insurance policy does exclude coverage for environmental pollution of the kind at issue in this case as well as personal injury resulting from such pollution, the comprehensive general liability policy nevertheless did cover the Loading Company in many other types of non-pollution related situations.

---

**5.** In *Karroll v. Automergic Chemetals Corp.*, No. 4087, 1991 WL 326052 (N.Y.Sup.Ct. Apr.9, 1991), the plaintiff was injured when a bottle of sulfuric acid broke and splashed on him. The trial court concluded that "[a]lthough sulfuric acid falls within the definition of 'pollutants' as set forth in the policy . . .

this incident did not arise out of pollution thus the pollution exclusion is inapplicable." 1991 WL 326052, at * 1. This conclusion was affirmed by the Appellate Division. *See Karroll v. Atomergic Chemetals Corp.*, 194 A.D.2d 715, 600 N.Y.S.2d 101 (N.Y.App.Div.1993).

Because we conclude that the trial court correctly granted the Insurance Company's motion for summary judgment pursuant to the Absolute Pollution Exclusion as to both of the other parties, we pretermit the issue of whether the trial court erred when it concluded the Owner was not an additional insured pursuant to the vendor's endorsement contained in the policy.

## V.

The judgment of the trial court is affirmed and this cause is remanded to the trial court for collection of the costs below. Costs on appeal are taxed one-half to the appellant, Sulphuric Acid Trading Company, Inc., and one-half to the Appellee, Xavier Chemical Company.