IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 23, 2018 Session

## AMCO INSURANCE COMPANY v. RALPH W. MELLO, ET AL.

Appeal from the Chancery Court for Williamson County
No. 43604     Joseph Woodruff, Judge

_____

### No. M2017-01904-COA-R3-CV

_____

This appeal involves a dispute between an insurance company and its insured regarding the application of exclusion clauses in a homeowners' insurance policy and a personal umbrella liability policy. After malicious prosecution and abuse of process claims were filed against the insured in Alabama by a law firm, the insurance company accepted the defense under a reservation of rights and filed the present action seeking a declaration that it is not required to provide coverage for the damages complained of in the Alabama lawsuit. Following a bench trial held on stipulated facts, the trial court determined that the insured was, in fact, entitled to certain coverage. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Parks T. Chastain and Cory R. Miller, Nashville, Tennessee, for the appellant, AMCO Insurance Company.

Ralph W. Mello, Nashville, Tennessee, pro se.

## OPINION

## BACKGROUND AND PROCEDURAL HISTORY

The Appellee Ralph Mello ("Mr. Mello") is a licensed Tennessee attorney. Over twenty years ago, in 1994, he undertook legal representation of one Scott Pogue ("Mr. Pogue") pursuant to a contingent fee agreement entered into between Mr. Pogue and Mr.

Mello.[1]  Mr. Mello was retained by Mr. Pogue in order to file a False Claims Act case on Mr. Pogue's behalf, and a lawsuit was subsequently filed in the United States District Court for the Middle District of Tennessee.  Over the course of his representation of Mr. Pogue, Mr. Mello billed in excess of 1,734 hours to the case.

In 2002, the firm of Hare, Wynn, Newell & Newton, LLP ("Hare, Wynn") was brought into the case to help with litigation.  At that time, it was agreed that Mr. Mello would no longer be involved with the case.  To replace the previous fee agreement that he had with Mr. Pogue, Mr. Mello entered into a new agreement on June 25, 2002.  This new fee agreement, to which Hare, Wynn was a party, provided that Mr. Mello was entitled to statutory fees as well as a contingency fee equal to 7.5% of Mr. Pogue's total recovery.

In 2005, Mr. Pogue agreed to settle a portion of his False Claims Act case, and he received a portion of that settlement as a relator's share.  Following this partial settlement, Mr. Mello brought an action to determine the rights of the parties under the June 25, 2002 fee agreement.  Hare, Wynn intervened in the action, and the matter was ultimately decided via arbitration.[2]  The decision rendered at arbitration left Mr. Mello entitled to 7.5% of Mr. Pogue's relator's share of the partial settlement.  In addition to claiming an interest in Mr. Pogue's relator's share, however, Mr. Mello also claimed an interest in the potential recovery for the remaining False Claims Act case.  He filed an attorney's lien on Mr. Pogue's cause of action and share of any recovery that remained.

On February 22, 2007, Mr. Pogue filed for bankruptcy protection in the United States Bankruptcy Court for the Northern District of Alabama.  As a result of the bankruptcy action, all of Mr. Pogue's rights in the False Claims Act case were transferred to James G. Henderson as liquidation trustee.

Before Mr. Henderson was actually appointed as liquidation trustee, Hare, Wynn had negotiated a settlement of the remaining claims in the False Claims Act case.  The settlement, which was completed on March 31, 2009, provided for a relator's share of $8,120,000.00.  The proceeds from the settlement were paid to the liquidation trustee.

Mr. Mello took umbrage at this settlement process.  Displeased with the fact that the settlement funds were deposited with the trustee, Mr. Mello claimed that Hare, Wynn had intentionally made no provisions in the settlement agreement for the recognition or satisfaction of his statutory attorney's lien, equitable lien, or of the assignment he

---

[1] This contingent fee agreement provided that if Mr. Pogue prevailed in his lawsuit, Mr. Mello would be entitled to 20% of any amount recovered.  A contingent fee agreement is one in which the attorney and client agree to a specific fee based on a successful recovery by the client.  The attorney agrees that if there is not a successful recovery by the client, the attorney is not entitled to a fee.

[2] The June 25, 2002 fee agreement contained an arbitration clause.

received in the June 25, 2002 fee agreement. He requested that the bankruptcy court order the liquidation trustee to disburse his portion of the contingent fee, and on March 2, 2010, he filed a complaint against Hare, Wynn in the Williamson County Chancery Court. In his chancery court action, Mr. Mello alleged that Hare, Wynn breached duties and converted funds due to him when it failed to pay him his 7.5% contingency fee from the additional recovery. In addition to seeking to recover the amount of his fee, Mr. Mello sought punitive damages against Hare, Wynn. Upon the filing of that action, the case was removed to the United States District Court for the Middle District of Tennessee. It was then transferred to the United States District Court for the Northern District of Alabama, where it was docketed as an adversarial proceeding in connection with Mr. Pogue's bankruptcy action. The bankruptcy court subsequently dismissed Mr. Mello's claims in November 2010.

In March 2012, Mr. Mello filed another lawsuit in the chancery court asserting similar allegations against Hare, Wynn; on April 24, 2012, the action was removed to the United States District Court for the Middle District of Tennessee. While this latest lawsuit was pending, the bankruptcy court ordered the bankruptcy trustee to disburse to Mr. Mello the full amount of his contingency fee. The fee was paid to Mr. Mello. Although Mr. Mello's latest action was eventually transferred to the United States District Court for the Northern District of Alabama, it was dismissed with prejudice in January 2013.

As a result of the litigation that had been brought against it, Hare, Wynn filed a lawsuit against Mr. Mello in the Circuit Court for Jefferson County, Alabama. The firm's complaint asserted causes of action for malicious prosecution and abuse of process. It was specifically alleged that Mr. Mello's March 2012 lawsuit was "filed with malice." Further, Hare, Wynn alleged that Mr. Mello's lawsuit was filed for an ulterior purpose, namely to force it to distribute fees prior to receiving an order from the bankruptcy court.

As is relevant herein, Mr. Mello tendered the Hare, Wynn complaint to his insurer, AMCO Insurance Company ("AMCO"). He requested that coverage and a defense be provided pursuant to both his homeowners' policy and his personal umbrella liability policy. Although AMCO appointed defense counsel in Alabama on behalf of Mr. Mello, it accepted the defense under a reservation of rights.[3]

---

[3] A reservation of rights is necessary for insurers who do not intend to waive their contractual rights to contest coverage:

> The general rule supported by the great weight of authority is that if a liability insuror, with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or

According to AMCO, neither the homeowners' policy nor the personal umbrella policy issued to Mr. Mello provided coverage for the injuries and damages complained of in the Hare, Wynn complaint. Seeking judicial sanction for this position, AMCO commenced the present litigation by filing an action for declaratory judgment in the Williamson County Chancery Court. In its complaint, AMCO contended that because the injuries complained of by Hare, Wynn arose out of the business pursuits of Mr. Mello, no coverage was available under his contracts of insurance. In support of this position, AMCO noted that the homeowners' policy contained an exclusion stating that personal injury coverage did not apply to injuries "arising out of the 'business' pursuits of an 'insured.'" Moreover, the umbrella policy provided that coverage did not apply to "'bodily injury', 'personal injury' or 'property damage' arising out of or in connection with a 'business' engaged in by an 'insured.'" In the view of AMCO, the injuries complained of by Hare, Wynn arose out of Mr. Mello's business pursuits inasmuch as the injuries complained of were those arising out of Mr. Mello's attempt to collect his attorney's fees.

The litigation below ultimately culminated with a trial being held on stipulated facts. Subsequently, on August 25, 2017, the trial court entered its "Memorandum and Order." Therein, the trial court held that there was no coverage under Mr. Mello's insurance policies with regard to the abuse of process claim filed against him by Hare, Wynn. However, the court did find that coverage existed with regard to Hare, Wynn's malicious prosecution claim. In reaching this conclusion, the trial court expressly rejected AMCO's argument that a "business pursuit" exclusion applied. This appeal followed.

## ISSUES PRESENTED

Although AMCO's appellate brief identifies three issues for our review, the raised issues all speak to the same concern: whether the trial court erred in holding that the damages claimed by Hare, Wynn in its suit against Mr. Mello did not arise out of, or were not connected with, Mr. Mello's business pursuits.

## STANDARD OF REVIEW

A trial court's factual findings are reviewed de novo upon the record with a presumption of correctness. *Ramsay v. Custer*, 387 S.W.3d 566, 568 (Tenn. Ct. App. 2012) (citation omitted). Issues related to the scope of coverage and an insurer's duty to defend present questions of law. *Standard Fire Ins. Co. v. Chester O'Donley & Assocs.,*

---

noncoverage.

*Maryland Cas. Co. v. Gordon*, 371 S.W.2d 460, 464 (Tenn. Ct. App. 1963) (quoting 29A Am. Jur. *Insurance* § 1465).

*Inc.*, 972 S.W.2d 1, 6 (Tenn. Ct. App. 1998) (citations omitted). Questions of law are reviewed de novo with no presumption of correctness. *Walker v. Nationwide Ins. Co.*, 813 S.W.2d 135, 140 (Tenn. Ct. App. 1990) (citations omitted).

## DISCUSSION

This appeal concerns what insurance coverage, if any, exists with respect to the claims filed against Mr. Mello in Alabama by the Hare, Wynn law firm. "Issues involving an insurance policy's coverage and an insurance company's duty to defend require 'the interpretation of the insurance policy in light of claims asserted against the insured.'" *Sulphuric Acid Trading Co., Inc. v. Greenwich Ins. Co.*, 211 S.W.3d 243, 248 (Tenn. Ct. App. 2006) (quoting *Allstate Ins. Co. v. Jordan*, 16 S.W.3d 777, 779 (Tenn. Ct. App. 1999)). As noted previously, the complaint filed by Hare, Wynn asserted causes of action for malicious prosecution and abuse of process. It alleged, among other things, that Mr. Mello had sued Hare, Wynn without probable cause and that he had attempted to "force" Hare, Wynn to distribute fees to him prior to receiving an order from the bankruptcy court despite the fact that the funds at issue were part of the bankruptcy estate and were paid to the bankruptcy trustee. Although there does not appear to be any dispute on appeal that Mr. Mello's insurance policies do not provide coverage for Hare, Wynn's abuse of process claim, there is vigorous disagreement concerning whether Mr. Mello is covered under his policies in light of the asserted malicious prosecution claim. Whereas AMCO contends in its appellate brief that it is absolved of any duty to defend or indemnify Mr. Mello, Mr. Mello argues that the trial court's decision as to his insurance coverage should be affirmed.

"In construing insurance policies, the words chosen to express the parties' intentions should be given their usual, natural and ordinary meaning." *State Farm Fire & Cas. Co. v. Sparks*, No. W2006-01036-COA-R3-CV, 2007 WL 4277454, at *5 (Tenn. Ct. App. Dec. 7, 2007) (citation omitted). Indeed, as this Court has noted:

> Contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and popular sense. The rule of strict construction does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties or disregard the evidence (intention) as expressed, or to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties and embodying requirements[.]

*Ballard v. N. Am. Life & Cas. Co.*, 667 S.W.2d 79, 82 (Tenn. Ct. App. 1983) (quoting *Guardian Life Ins. Co. of Am. v. Richardson*, 129 S.W.2d 1107, 1115-116 (Tenn. Ct. App. 1939)).

As a general matter, both of Mr. Mello's policies with AMCO *do* provide coverage for malicious prosecution claims. The homeowners' policy provides such "personal injury" coverage through "Premier Homeowners Endorsement 12601." Moreover, the umbrella policy specifically provides coverage for "malicious prosecution" and other identified "personal injury" for which an insured becomes legally liable. While AMCO does not dispute that such provisions exist, it nonetheless argues that coverage is not available due to exclusions that are present in both policies.

As AMCO notes, the endorsement in the homeowners' policy contains an exclusion specifying that "personal injury" coverage does not apply to "injury arising out of the 'business' pursuits of an 'insured.'" Similarly, the umbrella policy contains an exclusion which denies coverage for "'bodily injury', 'personal injury' or 'property damage' arising out of or in connection with a 'business' engaged in by an 'insured.'" The definition of "business" under both policies is nearly identical.[4] Under the homeowners' policy, "business" means:

a. A trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or
b. Any other activity engaged in for money or other compensation, except the following:

1) Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;
2) Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or
3) The rendering of home day care services to a relative of an "insured".

Under the umbrella policy, "business" means:

1. A trade, profession or occupation engaged in on a full-time or occasional basis; or
2. Any other activity engaged in for money or other compensation, except the following:

---

[4] The trial court's order stated that the policies provided identical definitions of "business," and in support thereof, the order referenced the policies that were attached as exhibits to AMCO's complaint for declaratory judgment. Although the definitions are virtually identical, the referenced exhibits reveal minor differences.

- 6 -

a. Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

b. Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or

c. The rendering of home day care services to a relative of an "insured".

Here, the dispute is simply whether Hare, Wynn's claimed damages for malicious prosecution fall under one of the exclusions mentioned above. Namely, do the claimed damages arise out of Mr. Mello's "'business' pursuits" or in connection with a "business" engaged by him? Answering this type of question has not always been an easy task for courts in previous cases. *See Robinson v. Utica Mut. Ins. Co.*, 585 S.W.2d 593, 595 (Tenn. 1979) (noting that courts encountering "business pursuit" exclusions have found the language difficult of application).

To test whether a "pursuit" is a "business," courts have typically looked to two elements: (1) continuity and (2) profit motive. *Allstate Ins. Co. v. Godsey*, No. 03A01-9107CV243, 1991 WL 261873, at *3 (Tenn. Ct. App. Dec. 13, 1991). As to the first element, courts consider whether something is a customary engagement or a stated occupation. *Id.* Differentiating between a business pursuit and non-business pursuit is significant because it distinguishes between those risks that the insurer intended to cover and those risks which were intended to be excluded. The whole purpose of a business pursuits exclusion is to "delete coverage which is not essential to the purchasers of the policy and which would normally require specialized underwriting and rating." *Sparks*, 2007 WL 4277454, at *12; *see also Allstate Ins. Co. v. Hallman*, 159 S.W.3d 640, 645 (Tex. 2005) ("[A]s numerous courts have recognized, the purpose of the business pursuits exclusion is to lower homeowners insurance premiums by removing coverage for activities that are not typically associated with the operation and maintenance of one's home."). Of course, to determine whether coverage exists, we look to the particular facts of the case and interpret the insurance policies in conjunction with these facts. *Mid-Century Ins. Co. v. Williams*, 174 S.W.3d 230, 240 (Tenn. Ct. App. 2005) ("We are required to interpret the contract to determine whether it applies to the facts of this case[.]").

In its Alabama action against Mr. Mello, Hare, Wynn sought damages as a result of the litigation Mr. Mello brought against the firm. Therefore, the central question before us is whether Mr. Mello's litigation efforts constituted a business pursuit. If that question can be answered in the affirmative, then the exclusions at issue are applicable, and no coverage is available to Mr. Mello.

In reaching the conclusion that coverage was available to Mr. Mello relative to Hare, Wynn's malicious prosecution claim, the trial court determined that Mr. Mello's litigation against Hare, Wynn did not satisfy the "profit motive" or "continuity" elements necessary to establish a "business pursuit." In the view of the trial court, Mr. Mello was

not seeking "profit," but was seeking damages based on Hare Wynn's failure to distribute his contractual interest in the relator's share. Moreover, the trial court pointed out that, while collecting attorney's fees is a regular engagement of law practices, Mr. Mello no longer practices as a private attorney.[5]

Respectfully, we are of the opinion that the trial court's determination on these matters was in error. The injuries complained of by Hare, Wynn clearly arose out of Mr. Mello's "business pursuits"/"business" so as to trigger the applicability of the exclusions relied upon by AMCO.[6] As outlined by Hare, Wynn's complaint: (1) Mr. Pogue retained Mr. Mello for legal representation; (2) pursuant to the June 25, 2002 contingency fee agreement, Mr. Mello was entitled to 7.5% of any recovery; (3) Mr. Pogue filed for bankruptcy in 2007; (4) when Hare, Wynn negotiated a final settlement of Mr. Pogue's lawsuit, settlement proceeds were paid to Hare, Wynn's trust account and then to the bankruptcy trustee; (5) Mr. Mello was displeased that the settlement funds had been deposited with the bankruptcy trustee; (6) Mr. Mello subsequently filed suit against Hare, Wynn asking, among other things, that he be awarded the amount of his fee; and (7) following the dismissal of this lawsuit, Mr. Mello filed another lawsuit asserting identical allegations against Hare, Wynn.[7] Based on these facts chronicled in the complaint, it is clear that Mr. Mello's litigation against the firm was in furtherance of his attempt to collect the amount of his attorney's fees relative to his representation of Mr. Pogue. We are of the opinion that Mr. Mello's efforts in this regard squarely qualify as a "business" matter or "business pursuit" within the meaning of his insurance policies. There was a clear profit motive inasmuch as Mr. Mello's litigation attempted to collect attorney's fees earned in his private practice of law.

Regarding the "continuity" element necessary to establish a business pursuit, although the trial court recognized that "collecting attorney's fees is a regular engagement of law practices in Tennessee,"[8] it found that the "continuity" element was

---

[5] The trial court's order reflects that Mr. Mello now practices law as in-house counsel for a corporation.

[6] Again, whereas Mr. Mello's homeowners' policy excluded coverage for certain injuries "arising out of the 'business' pursuits of an 'insured,'" the umbrella policy excluded coverage for certain injuries "arising out of or in connection with a 'business' engaged in by an 'insured.'"

[7] Hare, Wynn's complaint specifically stated that Mr. Mello's actions in filing his March 2012 lawsuit were intended to "force Hare, Wynn to disburse fees prior to receiving any Order from the Bankruptcy Court."

[8] Even if the pursuit of attorney's fees was itself not considered to constitute a "customary engagement" of Mr. Mello's, that does not in our view prevent the establishment of the "continuity" element to the extent that the activity was in furtherance of a regular business interest. *See Cambridge Mut. Fire Ins. Co. v. Sakon*, 31 A.3d 849, 856 (Conn. App. Ct. 2011) (noting that although the specific activity of bringing a lawsuit may not fall within the ordinary scope of the insured's business, the material

not established due to the fact that Mr. Mello no longer practices as a private attorney. We are of the opinion that this particular consideration is not dispositive of the issue before us. As AMCO has observed, Mr. Mello's efforts to secure the amount of his attorney's fees are somewhat analogous to the business pursuits engaged in by the insured in *Still v. Great Northern Insurance Co.*, 254 F. App'x 125 (3d Cir. 2007), and as such, we will briefly refer to that case as a helpful illustration. In *Still*, the insured founded a limited liability company and later served as its President, CEO, and Chairman of the Board. *Id.* at 126. A number of years after the company was founded, however, a dispute arose concerning the insured's employment and investments. *Id.* After the insured was terminated and the company issued additional shares to dilute his interest in the company, the insured commenced a suit in federal court alleging that the company's actions had violated the terms of several agreements. *Id.* Following the adjudication of this lawsuit in favor of the company, the insured filed a second action against the company in state court. *Id.* This was followed by the company's assertion of a counterclaim alleging that the prior federal action constituted wrongful use of civil process. *Id.* Believing that his homeowners' insurance policy provided coverage for malicious prosecution claims such as the counterclaim asserted by the company, the insured requested coverage for a defense. *Id.* His insurer denied coverage, however, on the basis that the underlying insurance policy precluded coverage for liability arising from "business pursuits." *Id.* The insured thereafter filed a complaint in federal court seeking a declaratory judgment that his insurer was required to defend the counterclaim, but the trial court entered judgment in favor of the insurer. *Id.* When the trial court's judgment was affirmed on appeal, the appellate court determined that the asserted counterclaim fell within the scope of the insurance policy's "business pursuits" exclusion, reasoning as follows: "[T]here can be no doubt that [the company's] counterclaim 'arose from' [the insured's] business with [the company], as the basis of the counterclaim was the federal suit that [the insured] pursued against [the company] to secure his employment and investment rights in the company." *Id.* at 127-28 (citations omitted).

Likewise, here, the malicious prosecution claim asserted by Hare, Wynn arose out of Mr. Mello's "business," as the basis of the malicious prosecution claim was the litigation that Mr. Mello pursued against Hare, Wynn to vindicate rights stemming from his private practice of law. Accordingly, we are of the opinion that the trial court erred in failing to conclude that the "business"/"business pursuits" exclusions from Mr. Mello's policies applied in this case. As neither the homeowners' policy nor umbrella policy provide coverage for the claims asserted against Mr. Mello in Alabama, we respectfully reverse the judgment of the trial court.

---

inquiry in regard to the continuity element is whether the insured is alleged to have acted in furtherance of his business interests by bringing the lawsuit).

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed, and the case is remanded to the trial court to enter a judgment in accordance with this Court's Opinion and for such other matters as may be necessary and consistent with this Opinion.

_____

ARNOLD B. GOLDIN, JUDGE